DOCKETED

DEC 2 0 2001

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

GELCO CORPORATION, a Delaware )  JUDGE JOAN H. LEFKOW
corporation, and CUSTOMIZED AUTO )
CREDIT SERVICES, INC., a Delaware )  **01C 9719**
corporation, )
)
        Plaintiffs, )  No.
)
    v. )
)
MAJOR CHEVROLET, INC., a New York )
corporation, )  MAGISTRATE JUDGE MASON
)
        Defendant.

## COMPLAINT

Gelco Corporation, f/k/a General Electric Capital Auto Financial Services, Inc.

("GECAFS") and Customized Auto Credit Services, Inc. ("CACS"), for their Complaint against

Major Chevrolet, Inc. ("Major Chevrolet" or "Defendant") state as follows:

### NATURE OF THE ACTION

1.      This Complaint is brought to recover damages incurred by GECAFS and

CACS resulting from the fraudulent activities of Major Chevrolet, a New York auto dealership.

Beginning in about 1998, Major Chevrolet engaged in a massive pattern of fraud involving

falsification of documents. Defendant purposefully misidentified the options, features and/or

condition of cars sold to GECAFS and CACS and provided to GECAFS falsified credit

information about customers seeking to lease or purchase new and used vehicles. Furthermore,

Defendant failed to provide either good and sole title or liens free of claims and encumbrances

on numerous vehicles financed by GECAFS and CACS, respectively. As a result of these

schemes, GECAFS and CACS have suffered significant damages.

## JURISDICTION AND VENUE

2.      Gelco Corporation is a Delaware corporation with its principal place of business in Barrington, Illinois.  CACS is a Delaware corporation with its principal place of business in Barrington, Illinois.

3.      On information and belief, Major Chevrolet is a New York corporation with its principal place of business in Long Island City, New York.

4.      This Court has jurisdiction under 28 U.S.C. § 1332.  There is complete diversity between the parties and the amount in controversy exceeds $75,000.

5.      Venue is proper under 28 U.S.C. § 1391(a)(2).  The contracts between GECAFS and Defendant and CACS and Defendant were entered into and/or performed in this district, and the Defendant's breach of these contracts occurred when the Defendant submitted fraudulent lease documents to GECAFS and retail installment contract documents to CACS in this district.  The Defendant thereby committed tortious acts in this district.

## BACKGROUND

6.      Defendant entered into a Dealer Lease Plan Agreement (the "Lease Agreement") (Ex. A hereto) with GECAFS on October 30, 1989.  Pursuant to the Lease Agreement, Defendant would negotiate lease terms with customers.  If certain conditions were met, GECAFS paid Defendant the price Defendant had negotiated with the customer for the vehicle less any acquisition fees and/or down payment, and defendant then assigned to GECAFS the lease and all of Defendant's rights, title and interest in the vehicle.

7.      Defendant also entered into a Dealer Retail Agreement (the "Retail Agreement") (Ex. B hereto) with CACS on December 21, 1995. Pursuant to the Retail Agreement, Defendant would negotiate retail sale contracts with customers. If certain conditions were met, CACS paid Defendant the price Defendant had negotiated with the customer for the contract less any acquisition fees and/or down payment, and defendant assigned to CACS the contract and all of Defendant's rights therein.

### The Credit Fraud Scheme

8.      For each lease sold to GECAFS, Defendant was required to submit documentation to GECAFS, including a completed customer credit application. The customer credit application was completed as part of the lease or sale contract negotiation process and used by GECAFS to determine the customer's credit-worthiness.

9.      On information and belief, Defendant's employees obtained relevant credit information by interviewing the customer and completing a credit application. Among other information, customers were asked to provide their employment history, current employer, job title, salary and occasionally proof of income.

10.      Defendant then faxed the completed credit application to GECAFS in Barrington, Illinois and the information from the application was input into the GECAFS computer system. GECAFS also retrieved credit bureau reports describing the credit history of each customer for whom a credit application was submitted. The credit bureau reports typically did not include information about the customer's employment history, current employer, job title, or salary.

11.     Using the information from the customer's credit application and the customer's credit bureau reports, GECAFS determined the customer's credit-worthiness and provided a "credit call" for the customer. GECAFS either approved the lease deal with no stipulations, approved the lease deal with certain stipulations, or rejected the lease deal.

12.     GECAFS then faxed its credit decision back to Defendant. Defendant completed the necessary paperwork and upon approval, GECAFS provided payment for the lease and vehicle to the dealer.

13.     Beginning in or about April 1999, Defendant engaged in a scheme to defraud GECAFS. Defendant purposefully misrepresented information on customer credit applications that were sent to GECAFS. Specifically, the Defendant misrepresented customers' employment history, job status, salary information, and secondary income sources and amounts. For example, a customer who reported that he or she worked as a cable splicer with a monthly salary of $2,400 would be reported by the Defendant as a regional manager with a monthly salary of $6,300. On numerous occasions, Defendant also falsified other credit application information, including but not limited to the amount of money the customer had provided as a down payment for the lease.

14.     On other occasions, Defendant substituted the credit information of a third party as lessee instead of the credit information of the individual utilizing the vehicle. For example, in situations where the prospective lessee was thought to have credit either insufficient or too poor to lease a vehicle, Defendant would list a family member or friend with better credit as the lessee of the vehicle and submit to GECAFS that individual's credit information. In

reality, the car was being utilized by the first individual with insufficient or poor credit and that individual would be the person making payments to GECAFS and the primary insured.

15.     On information and belief, in most cases, Defendant's misrepresentations were made without the knowledge of customers.

16.     GECAFS made credit decisions relying on the falsified credit information provided by Defendant. GECAFS agreed to finance leases that it would not otherwise have financed and provided more favorable credit terms than certain customers would have been offered if their credit information had been reported accurately by Defendant.

17.     As a result of the Defendant's misrepresentation of credit information, GECAFS has experienced significant losses from customers' lease defaults and failures to make timely lease payments.

### The Vehicle Misidentification Scheme – Leased Vehicles

18.     For vehicles it leased, Defendant was also required to submit to GECAFS a properly completed lease form and a vehicle condition report providing the purchase price of the vehicle, and identifying the vehicle's make, model and "trim level" – i.e., the package of amenities and features included on the vehicle.

19.     The adjusted capitalized cost of a vehicle is the sale price of the vehicle as negotiated between the dealer and the customer, less any down payment or trade allowance. Lease payments have two components: depreciation and the lease charge. Depreciation is determined by subtracting the vehicle's residual value — an estimate of what the vehicle will be worth at the lease termination — from the adjusted capitalized cost of the vehicle. Residual

value is calculated as the expected wholesale value of the vehicle at the end of the lease term adjusted for certain optional equipment.

20.     Vehicles with higher trim levels have higher residual values. By way of example, at a certain point in time, a 1995 Nissan Pathfinder **XE** had a residual value of $10,086. The residual value of the same model car with a higher, luxury trim level, the 1995 Nissan Pathfinder **LE**, was $14,060, or more than 39% higher than the base model.

21.     Beginning in or about April 1999, the Defendant engaged in a scheme to defraud GECAFS. The Defendant purposefully misidentified trim levels and value added options on documentation provided to GECAFS for vehicles it had leased. The falsified documentation was then used to set the residual value of vehicles, resulting in grossly overstated residual values. GECAFS received monthly payments that were below the appropriate level because of the overstated residual value of the vehicles. Moreover, at lease termination, GECAFS has vehicles worth significantly less than the stated residual value.

22.     The Defendant would negotiate a capitalized cost in line with the market value of the vehicle. The falsified documents were used only to set residual values. The lease, along with the falsified documents, was submitted to GECAFS in Barrington, Illinois.

**The Vehicle Misidentification Scheme – Retail Vehicles**

23.     For vehicles it sold to customers that were financed by CACS, Defendant was required to submit documentation identifying the sale price Defendant had negotiated with the customer, the actual "book value" of the vehicle, (i.e., the "trade-in" value of the vehicle as listed in the *NADA Official Used Car Guide*) the trim level of the vehicle, and any options already present or installed by the dealer on the vehicle.

24.     Pursuant to CACS' retail program guidelines, for approved sales made by the Defendant, CACS agreed to finance up to 115% of the total NADA trade-in value of used vehicles. Additionally, CACS agreed to finance tax, title, license and warranty protection up to a total financed value of not more than 140% of NADA trade-in value.

25.     Beginning in or about August 1998, the Defendant engaged in a scheme to defraud CACS. The Defendant purposefully misidentified trim levels and/or vehicle options on documents provided to CACS for vehicles it had sold. The falsified documents were submitted to CACS in Barrington, Illinois and stated that vehicles sold by the Defendant included options that were not actually installed and/or misidentified the trim level of the vehicle.

26.     As a result of these misrepresentations concerning trim levels and value-added options, the Defendant misrepresented the NADA trade-in value of the vehicles. For example, in early 2000, the NADA trade-in value of a 1997 Nissan Altima **GLE** was $14,850. The NADA trade-in value of the same vehicle, with the a corrected trim level of **GXE**, was $10,625.

27.     Increasing the NADA trade-in value of the vehicle allowed the Defendant to increase the maximum amount financed from CACS on deals that otherwise would have been financed for a lower amount (or would not have been financed at all) if the Defendant had provided accurate information about vehicle trim level and/or vehicle options – and thus had provided the true NADA trade-in value of the vehicle.

28.     As a result of Defendant's misrepresentation, in many cases CACS provided financing above and beyond its 115% limitation of the proper NADA trade-in value of vehicles. Furthermore, even when the vehicle advance did not exceed the 115% limit, the

Defendant's falsification of the vehicle trim level and/or options artificially decreased the vehicle advance/NADA trade-in value ratio and at times resulted in the customer receiving more favorable credit terms than would have been provided if the true advance ratio had been known.

29.     In addition to the schemes described above, Defendant has also engaged in various other fraudulent conduct that violated the Lease and Retail Agreements.

30.     On numerous occasions, Defendant sold to GECAFS: (a) vehicles that had been previously repurchased by the manufacturer (lemons); (b) vehicles with odometer reporting discrepancies (which caused improper residual value calculation); (c) vehicles that had been used for Taxi and Livery purposes; and/or (d) vehicles of Canadian origin.

31.     On numerous occasions, Defendant failed to provide free and clear titles on vehicles it sold to GECAFS pursuant to the Lease Agreement. On other occasions, defendant failed to provide perfected liens, free and clear of claims or other encumbrances, pursuant to the Defendant's Retail Agreement with CACS.

## COUNT I
## FRAUD

32.     GECAFS and CACS incorporate by reference paragraphs 1 through 31.

33.     The Defendant's misrepresentation of customers' credit information and its submission of falsified customer credit applications was done with the intent to mislead GECAFS.

34.     The Defendant's failure to identify vehicles that had been repurchased by the manufacturer (lemons); vehicles with odometer discrepancies (where the residual was

8

calculated with a different mileage than that submitted to the state), vehicles that had been used for Taxi and Livery purposes; and/or vehicles of Canadian origin was done with the intent to mislead GECAFS.

35.     The Defendant's misrepresentation of the residual value of vehicles and its submission of fraudulent vehicle condition reports, odometer readings, residual calculation worksheets, purchase order lease worksheets, and vehicle book-out sheets was done with the intent to mislead GECAFS and CACS.

36.     GECAFS and CACS reasonably relied upon the representations and documents provided by the Defendant.

37.     GECAFS and CACS have been damaged by over $2.95 million by the misrepresentations.

**COUNT II**
**BREACH OF CONTRACT – Dealer Lease Plan Agreement**

38.     GECAFS and CACS incorporate by reference paragraphs 1 through 37.

39.     The Defendant promised that for each lease and leased vehicle that it was selling and that GECAFS was buying, "[a]ny credit information furnished by the dealer as to the lessee is true, complete and accurate to the best of dealer's information and belief." (Ex. A, ¶ 6(e)).

40.     The Defendant breached this contract in each of the approximately 1,000 transactions where it intentionally provided false customer credit information.

41.     The Defendant also promised, for each lease and lease vehicle that it was selling and that GECAFS was buying, that the vehicle GECAFS was buying was the vehicle identified by the vehicle condition report, lease form and/or other documentation submitted to GECAFS.

42.     The Defendant breached this contract in each of the transactions in which it fraudulently misidentified vehicle trim levels and/or odometer readings and overstated residual value.

43.     The Defendant promised that for each lease and lease vehicle that it was selling and that GECAFS was buying, that the Defendant "had good title to the lease and the leased vehicle both of which shall be free and clear of all liens and encumbrances." (Ex. A, ¶6(a)).

44.     The Defendant breached this contract in each of the transactions in which it refused to provide free and clear title to vehicles leased by Defendant and sold to GECAFS.

45.     Pursuant to the Lease Agreement, because of its breach of contract, the Defendant is obligated to repurchase each vehicle subject to a lease for which it breached the contract. The repurchase price is the sum of:

> (1) the residual value of the leased vehicle; (2) the aggregate of all passed due lease payments; and (3) the amount which is the product of the monthly depreciation factor times the number of months remaining in the lease term.

(Ex. A, ¶ 8(a)). In addition, the Defendant must pay any tax assessed on the repurchase and any fees or taxes the lessee is obligated to pay. (Id.)

46.     On August 17, 2001 and September 5, 2001, GECAFS made demands on the Defendant to repurchase all leases and leased vehicles for which incorrect, misleading or fraudulent information was submitted to GECAFS and to compensate GECFAS for losses sustained where information was misrepresented. The Defendant has refused to make these payments or to repurchase the vehicles.

47.     The Defendant's breach of the Lease Agreement, and its refusal to make the payments demanded or repurchase the vehicles has damaged GECAFS.

48.     GECAFS has fully performed all its obligations under the Dealer Lease Plan Agreement.

### COUNT III
### BREACH OF CONTRACT – Retail Agreement

49.     GECAFS and CACS incorporate by reference paragraphs 1 through 48.

50.     The Defendant promised, for each retail contract that it was selling and that CACS was buying, that "[t]he vehicle and all options therein are accurately described in the Contract and that such Vehicle was delivered by Dealer and accepted by Buyer(s)." (Ex. B, ¶ 10(J)).

51.     The Defendant breached this contract in each of the transactions in which it fraudulently misidentified vehicle trim levels or value added options.

52.     The Defendant also promised, for each retail contract that it was selling and that CACS was buying, that "[t]he contract is owned by the Dealer at the time or sale to Buyer(s), and is free and clear from all liens, set-offs or counterclaims." (Ex. B, ¶ 10(E)).

53.    The Defendant breached this contract in each of the transactions in which it failed to provide perfected liens, free and clear of claims or other encumbrances.

54.    Pursuant to the Retail Agreement, because of its breach of contract, the Defendant is obligated to repurchase each contract for which it submitted fraudulent documentation or failed to provide a perfected lien to CACS. The repurchase amount includes one or more of the following amounts at the election of CACS:

> (1) the unpaid balance, as determined by CACS, of any or all Contracts purchased hereunder, less any unearned finance charges and any discounts in connection with such Contracts; (2) all losses and expenses incurred by CACS as a result of such breach, or untruth, or failure to perform, including attorneys fees; and (3) out-of-pocket expenses paid or incurred by CACS in connection with the collection of any amount due under any such Contract, including attorneys' fees and costs of litigation, whether by or against CACS, and expenses with respect to repossessing, storing, repairing and selling the Vehicle.

(Ex. B, ¶ 11).

55.    On August 17, 2001 and September 5, 2001, GECAFS and CACS made demands on the Defendant to repurchase retail contracts and to compensate GECFAS and CACS for losses sustained where information was misrepresented. The Defendant has refused to make these payments or repurchase the vehicles.

56.    The Defendant's breach of the Retail Agreement, and its refusal to make the payments demanded or repurchase the vehicles has damaged CACS.

57.    CACS has fully performed all its obligations under the Dealer Retail Agreement.

## COUNT IV
## ILLINOIS CONSUMER FRAUD ACT

58.     GECAFS and CACS incorporate by reference paragraphs 1 through 57.

59.     The Defendant was engaged in the business of selling and leasing automobiles.

60.     The deceptive and fraudulent acts of the Defendant with respect to GECAFS and CACS occurred in the course of conduct involving trade or commerce, and thus constitute violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Consumer Fraud Act"), 815 ILCS 505/1, *et seq.*

61.     The Defendant intended that GECAFS and CACS rely upon its deceptive acts, including but not limited to the dealers' pattern of falsifying customer credit information and misrepresentation of vehicle trim levels for lease vehicles and vehicle trim and option levels for retail sale documents.

62.     As a direct result of the Defendant's conduct, GECAFS and CACS have suffered considerable economic harm.  GECAFS and CACS have also incurred substantial investigative and litigation expenses in connection with the Defendant's fraudulent schemes.

WHEREFORE, GECAFS and CACS pray for judgment in their favor and against the Defendant as follows:

A.   Compensatory damages for all loss suffered by GECAFS and CACS;

B.   Punitive damages;

C.   Attorneys' fees and costs; and

D.   Such other relief as this Court deems just and proper.

GECAFS and CACS demand trial by jury.

Respectfully submitted,

GELCO CORPORATION and
CUSTOMIZED AUTO CREDIT
SERVICES, INC.

By: _____
One of their Attorneys

David B. Johnson
Michael C. Andolina
SIDLEY AUSTIN BROWN & WOOD
Bank One Plaza
10 S. Dearborn Street
Chicago, Illinois  60603
(312) 853-7000

Dated: December 19, 2001

14



**GE Capital**

# Dealer Lease Plan Agreement

This Agreement is entered into by and between GENERAL ELECTRIC CAPITAL AUTO LEASE, INC. ("GECAL"), located at P.O. Box 310, Barrington, Illinois 60011 and the undersigned ("DEALER"):

1. **DEALER FEE.** Unless previously remitted, DEALER shall pay to GECAL upon execution of this Agreement a non-refundable fee of $_____

2. **PURCHASE OF LEASES.**
   a. **Purchase Price.** GECAL shall purchase a lease and leased vehicle for a sum agreed upon between GECAL and DEALER.
   b. **Payment Of Purchase Price.** GECAL shall become obligated to purchase the lease and leased vehicle on the date GECAL has received all of the following items and the purchase price shall be payable within 10 days after such date:
      (1) The subject lease which:
          (a) is in a correct and complete form in accordance with GECAL's instructions;
          (b) has been duly and properly executed by lessee and DEALER;
          (c) has been duly and properly assigned by DEALER to GECAL; and
          (d) has been issued an approval number within the 60 day period preceding receipt of the lease by GECAL.
      (2) All other documents in an acceptable form and information which GECAL may require in connection with the subject lease transaction; and
      (3) All monies received by DEALER from the lessee prior to, at the time of, or subsequent to lease execution and vehicle delivery except for: (a) amounts necessary to pay appropriate governmental entities for the registration and titling of the leased vehicle if DEALER is to perform such function, and (b) other amounts as directed by GECAL.
   c. **Joint Payees.** GECAL reserves the right to make any check or draft jointly payable to DEALER and to any third person who either holds a security interest in the inventory assets of DEALER or who sold the leased vehicle to DEALER.

3. **MECHANICAL BREAKDOWN PROTECTION CONTRACTS.**
   a. **Acceptability Of MBP Contract.** Dealer may sell to the lessee a mechanical breakdown protection contract ("MBP Contract") covering the leased vehicle subject to the acceptability of the form, administrator, if any, and underwriter of the MBP Contract to GECAL.
   b. **Cancellation Of MBP Contract.** Whether an acceptable MBP Contract is sold to the lessee for cash or the cash price therefor is financed in connection with the lease, DEALER agrees that the MBP Contract shall be cancellable upon the demand of either the lessee, in which case DEALER shall immediately notify GECAL thereof, or GECAL or by operation of law. In the event of any such cancellation the lessee shall be entitled to a refund credit of the unearned portion of the cash price as provided in the MBP Contract or lease or as otherwise required by law, whichever provides for the greatest refund credit. DEALER's liability under this paragraph shall be limited to that amount DEALER collected and retained or otherwise received in connection with the sale of the MBP Contract which is determined by the foregoing standards to be subject to refund. DEALER shall remit its portion of the credit to the lessee, GECAL or some third party within 15 days of cancellation as directed by GECAL. Such refund credit may, if so provided in the lease, be subject to GECAL's security interest therein.

4. **DEALER LIABILITY FOR LESSEE DEFAULT.**
   a. **New Vehicle Lease.** Where the leased vehicle is a new vehicle, DEALER shall not be liable for any default of the lessee under a lease which occurs after the date GECAL becomes obligated to purchase the lease and leased vehicle pursuant to paragraph 2b.
   b. **Used Vehicle Lease.** Where the leased vehicle is a used vehicle and for any cause or reason the lease becomes in default or the Lessee otherwise refuses to perform thereunder within 90 days of the due date of the initial lease payment billed by GECAL, DEALER shall repurchase the lease and leased vehicle upon GECAL's tendering the vehicle to DEALER not more than 30 days after the expiration of such 90 day period.

5. **DEALER'S GENERAL WARRANTIES.** So long as this agreement is in effect, DEALER warrants, covenants and agrees that:
   a. If it is a corporation, it is in good standing in the state of its incorporation and it has obtained the necessary resolution of its Board of Directors and, if required, the necessary shareholders' ratification of the making of this agreement.
   b. It is prior to entering into a lease which is subsequently assigned to GECAL licensed and authorized to enter into such lease in the state or states where the provisions of the lease are negotiated, the lease is executed and the leased vehicle is delivered.
   c. If it conducts business under a fictitious trade name or trade style, that it has and will comply with all applicable laws relating to the doing of business under a fictitious trade name or trade style.
   d. It shall not represent that it is the agent of GECAL.

6. **DEALER'S SPECIFIC WARRANTIES AS TO EACH LEASE.** As to each lease purchased by GECAL, DEALER further warrants that as of the date GECAL becomes obligated to purchase the lease and leased vehicle:
   a. DEALER has good title to the lease and the leased vehicle both of which shall be free and clear from all liens and encumbrances.
   b. DEALER has complied with all applicable state, federal and local laws and regulations regarding or relating to the lease transaction.
   c. Neither DEALER nor any of its employees has made any oral or written promise, affirmation, warranty or representation to any lessee that is not contained in the lease including, without limiting the generality of the foregoing, any representation that the lessee has any option to purchase the leased vehicle unless such an option is contained in the Lease or any warranty which is inconsistent with or greater than any manufacturer's warranty then in effect as to the leased vehicle.
   d. Lessee is not in default under the lease.
   e. Any credit information furnished by DEALER as to the lessee is true, complete and accurate to the best of DEALER's information and belief.
   f. Lessee has no offsets or counterclaims regarding or defenses to the enforcement of the lease.
   g. Lessee has obtained prior to or contemporaneously with vehicle delivery and maintains the insurance coverage as required under the lease.
   h. Lessee executed the lease prior to vehicle delivery and Lessee has accepted vehicle delivery.
   i. DEALER has titled and registered the leased vehicle, or has made application therefor, as instructed by GECAL.

7. **GECAL'S REMEDIES UPON DEALER DEFAULT OR BREACH OF WARRANTY.** Should dealer default in the performance of any term or condition herein or should DEALER breach any warranty herein, then in addition to the rights and remedies hereinabove set forth, GECAL may demand that DEALER repurchase the subject lease(s) and leased vehicle(s) purchased by GECAL from DEALER pursuant to this Agreement and the repurchase price shall be computed in accordance with paragraph 8 hereof. Should any bankruptcy or insolvency proceeding be initiated by or against DEALER, then in addition to the rights and remedies hereinabove set forth, GECAL may demand that DEALER repurchase all, or any portion of the leases and leased vehicles purchased by GECAL from DEALER pursuant to this Agreement and the repurchase price shall be computed in accordance with paragraph 8 hereof. Should suit be initiated to enforce any provision of this Agreement, the prevailing party shall be entitled to an award of all costs incurred and reasonable attorney's fees.

*EXHIBIT A*

8.  **DEALER REPURCHASE OF LEASES.**
    a.  **Repurchase Price.** As to each lease which DEALER must repurchase hereunder, the repurchase price shall be the sum of the following:
        (1)  The residual value of the leased vehicle;
        (2)  The aggregate of all past due lease payments; and,
        (3)  The amount which is the product of the monthly depreciation factor times the number of months remaining in the lease term.
        If the repurchase price of the lease and/or leased vehicle is, or is subsequently determined to be, a taxable event giving rise to an obligation of GECAL to pay sales or use tax to any governmental entity, said amount of tax shall also be paid upon repurchase or, if not collected at time of repurchase, upon demand for payment by GECAL.
    b.  **GECAL's Rights Pending Payment Of Repurchase Price.** Until the repurchase price has been received by GECAL, it is the intent of the parties that DEALER have no right, title or interest in either the lease or the leased vehicle. If, however, after demand for repurchase but prior to payment DEALER shall be deemed to have acquired an interest in a lease or vehicle giving DEALER title therein or the right to force GECAL to deliver title thereto, GECAL shall have a security interest therein under the Uniform Commercial Code as security for the performance by DEALER of its obligations hereunder, and GECAL and DEALER shall have the respective rights, remedies and obligations of a creditor and debtor with respect thereto. DEALER shall remain liable for any deficiency following disposition.

9.  **SERVICE.** GECAL shall have no obligation to service any vehicle leased by DEALER pursuant to this agreement. DEALER shall service or procure service through a franchised dealer affiliate of DEALER for each vehicle at the Lessee's or GECAL's request to the extent of DEALER's or its affiliate's best servicing capabilities and at prices consistent with prices charged to other customers of DEALER or its affiliate. DEALER shall perform warranty service or procure warranty service through a franchised dealer affiliate of DEALER on each leased vehicle for which DEALER or an affiliate is the manufacturer's franchised dealer if so requested by GECAL or the lessee.

10. **LEASE CONTRACT FORMS.** GECAL shall be under no obligation to purchase any lease which is not in a contract form acceptable to GECAL. GECAL shall furnish DEALER with standard contract forms for use by DEALER. Except that such standard contract forms shall be considered to be in preprinted form which is acceptable to GECAL, GECAL makes no representation or warranty of any kind, express or implied, with respect thereto.

11. **TERM.** This Agreement shall continue in force until terminated by either party. Either party may terminate this Agreement by sending to the other party notice of termination which shall be effective three days after the mailing of such notice. Termination by either party shall not relieve DEALER of its obligations set forth herein as to any lease purchased by GECAL from DEALER pursuant to this Agreement.

12. **DEALER INDEMNITY.** DEALER shall indemnify, defend and hold GECAL harmless from any claim, loss, damage, liability or expense, including court costs and attorney's fees, incurred by GECAL in connection with a lease or leased vehicle arising out of an event which occurs either prior to the date on which GECAL becomes obligated to purchase the lease and leased vehicle or subsequent to the date of repurchase thereof by DEALER pursuant to paragraph 8 hereof. This indemnity shall include strict liability proceedings.

13. **WAIVER.** No failure or delay by GECAL either to exercise any right or remedy it may have or to require the existence of any condition or to require the performance of any obligation of DEALER hereunder shall operate as a waiver thereof and such right, remedy, obligation or condition shall remain in full force and effect as if such failure or delay had not occurred. Without limiting the generality of the foregoing, GECAL may excuse the failure of DEALER to execute duly and properly the assignment provisions of a lease tendered to GECAL in which case the lease shall be deemed duly and properly assigned as of the date GECAL otherwise becomes obligated to purchase the lease and leased vehicle.

14. **APPLICABLE LAW.** The interpretation and construction of this Agreement, wherever made and executed and wherever to be performed shall be governed by the laws of the State of Illinois. Should any particular provision of this Agreement, or any phrase, sentence, clause or paragraph be determined to be unenforceable by any court of competent jurisdiction such unenforceability shall not affect any other term or condition of this Agreement, but this Agreement shall be construed as if such invalid, illegal or unenforceable term or condition had never been contained herein. This Agreement shall become effective upon its execution by DEALER and subsequent acceptance by GECAL at its address set forth above.

15. **NOTICES.** Except as expressly permitted in this Agreement, all notices required or permitted to be given hereunder shall be in writing and shall be effective upon personal delivery or deposited in the U.S. mail, postage prepaid and properly addressed. Each party shall promptly provide the other with notice of any change in the first party's address.

16. **ENTIRE AGREEMENT.** This Agreement shall constitute the entire agreement between the parties hereto pertaining to the purchase of leases by GECAL from DEALER and may not be modified other than by a written agreement executed by the party to be charged.

17. **AMENDMENTS.** This Agreement may be amended either by a separate writing which is dated and executed by both GECAL and DEALER or by a separate writing which is forwarded to and received by DEALER from GECAL in which case the amendments contained therein shall be deemed accepted without qualification by DEALER upon the issuance, pursuant to Dealer's request, of the first lease approval number by GECAL following the receipt of such writing.

18. **MISCELLANEOUS.** Headings inserted at the beginning of each section hereof are for convenience only and are not intended to otherwise influence or affect the interpretation of any provision of this agreement.

Executed on ____ 10 / 30 ____, 19 89

Accepted:
General Electric Capital Auto Lease, Inc.

By: _____  Title _ROA_

Address: P.O. Box 310
Barrington, IL 60011

Major Chevrolet, Inc.

DEALER (Legal Name)

By: _____  Title _____

By: _____  Title _____

Address  43-40 Northern Blvd.

City  Long Island City  State  NY 11101

 **Customized Auto Credit Services, Inc.**

# Dealer Retail Agreement

THIS RETAIL AGREEMENT between Customized Auto Credit Services, Inc., a Delaware corporation ("CACS"), and the undersigned dealer ("Dealer").

**1. ENTIRE AGREEMENT.** This Agreement is the entire agreement between CACS and Dealer regarding the purchase by CACS from Dealer of Contracts and Vehicles as defined below. Section headings are included in this Agreement for reference only and do not affect the interpretation of this Agreement.

**2. DEFINITIONS.** As used herein:
  A. "Agreement" means this Dealer Retail Agreement as may be amended from time to time in accordance with Section 23 hereof.
  B. "Buyer(s)" means any person(s), including any co-Buyer(s) or guarantor(s), who enter into a Contract with Dealer for the purchase of a Vehicle.
  C. "Contract" means a retail installment sale contract, conditional sale contract, or other document providing for the payment by Buyer(s) to Dealer of funds in connection with a retail credit sale of a new or used motor vehicle owned by Dealer to Buyer(s); and
  D. "Vehicle" means the new or used motor vehicle owned by Dealer which is the subject of a Contract.

**3. SALE AND PURCHASE OF CONTRACTS.**
  A. Contract Documentation and Sale. If Dealer wishes CACS to purchase a Contract hereunder, Dealer shall furnish CACS with: (i) the transaction's proposed term, (ii) any credit information Dealer has regarding Buyer(s), and (iii) such other information as CACS shall request. Upon receipt of all required documentation, CACS will decide in its sole discretion whether it will purchase a Contract. CACS will give Dealer an approval number for each approved transaction. Upon receipt of such approval number, Dealer shall procure all documents as are requested by CACS, including but not limited to evidence of physical damage insurance covering the Vehicle as required by CACS. Upon receipt by Dealer of the documents requested by CACS, each properly executed by Buyer and approved by Dealer, Dealer shall execute those documents required to be executed by the seller and shall thereafter deliver the Vehicle to Buyer(s). Following such execution and subsequent delivery of the Vehicle, Dealer shall promptly forward to CACS the Contract and other documentation required by CACS after which CACS may purchase the Contract in accordance with Section 3(B).
  B. Purchase Price and Payment. CACS will purchase a Contract and pay to Dealer such price as CACS shall from time to time establish for the purchase of Contracts, so long as Dealer provides to CACS documentation required by, and in a form satisfactory to, CACS within thirty (30) days of CACS's issuance of an approval number for the transaction. Nothing in this Agreement shall be construed to obligate Dealer to sell Contracts to CACS or to obligate CACS to purchase Contracts from Dealer.

**4. PERFECTION OF SECURITY INTEREST.** For every Contract purchased by CACS, Dealer will file and record all documents necessary to perfect the valid and enforceable first priority security interest of CACS in the Vehicle and will send CACS the filing receipts. In states where security interests are noted on certificates of title or registration, Dealer will complete the necessary forms and documents and forward them, together with the appropriate fees, to those public officials who are responsible for issuing the certificate of title or registration and will send CACS evidence that CACS's security interest is noted on the certificate of title or registration.

**5. MECHANICAL BREAKDOWN PROTECTION CONTRACTS AND CREDIT INSURANCE.**
  A. Acceptability of MBP Contract and Credit Insurance. CACS will finance a mechanical breakdown protection contract ("MBP Contract") covering the Vehicle or Credit Insurance Policies, including credit life insurance and/or accident or health insurance ("Credit Insurance Policy") sold by Dealer subject to the acceptability to CACS of the form, administrator, if any, and underwriter of the MBP Contract or Credit Insurance Policy.
  B. Cancellation of MBP Contract or Credit Insurance. If an acceptable MBP Contract or Credit Insurance Policy is sold to Buyer(s) and financed as part of the Contract, Dealer agrees that the MBP Contract or the Credit Insurance Policy shall be cancelable upon the demand of Buyer(s) (in which case Dealer shall immediately notify CACS thereof), or CACS, or by operation of law. In the event of any such cancellation, Buyer(s) shall be entitled to a refund of the unearned portion of the cash price as provided in the MBP Contract, or Credit Insurance Policy or Contract, or as otherwise required by law, whichever provides for the greatest refund of credit. As between CACS and Dealer, Dealer's liability under this paragraph shall be limited to that amount Dealer collected and retained as consideration of the refund to Buyer(s). CACS or appropriate third party within fifteen (15) days of cancellation as directed by CACS. Such refund may, if so provided in the Contract, be subject to a security interest of CACS therein.

**6. BOOKS, RECORDS AND FINANCIAL STATEMENTS.** Dealer shall maintain complete and accurate records concerning the sale to CACS of each Contract and underlying Vehicle, and all other transactions affecting the Vehicle. CACS may at any time upon reasonable notice inspect Dealer's records. Dealer will furnish CACS with financial statements from time to time when requested by CACS, or immediately without request in the event of any material change in Dealer's financial condition.

**7. PAYMENTS FROM BUYER(S).** Should any payment be made to Dealer under a Contract sold to CACS, Dealer will receive such payment in trust and will remit same to CACS immediately in the form received for credit to such Contract.

**8. POWER OF ATTORNEY.** Dealer authorizes CACS to sign and endorse Dealer's name upon any checks, drafts, money orders or other forms of payment that may come into CACS's possession as payment of or on account of any Contract. Dealer authorizes CACS to sign its name to any assignment of any Contract to CACS and to sign and endorse Dealer's name on any other instrument necessary to carry out the intent of this Agreement. This Power of Attorney shall be irrevocable and shall remain in effect for so long as there are Contracts outstanding which have been purchased pursuant to this Agreement.

**9. DEALER'S GENERAL WARRANTIES.** So long as this Agreement is in effect, Dealer warrants and agrees that:
  A. If it is a corporation, it is and will remain in good standing in the state of its incorporation and it has obtained the necessary resolution of its Board of Directors and, if required, the necessary shareholders' ratification of the making of this Agreement.
  B. At the time Dealer enters into a Contract which is subsequently sold to CACS, Dealer is properly licensed to sell motor vehicles in the state(s) where Dealer conducts its business.
  C. If Dealer conducts business under a fictitious tradename or as a partnership, it is and will remain in compliance with all applicable laws relating to conducting business under a fictitious trade name or as a partnership.
  D. It shall not represent that it is the agent of CACS.
  E. All financial statements of Dealer and other information supplied by Dealer to CACS are and will be true, complete and accurate.

**10. DEALER'S SPECIFIC WARRANTIES AS TO EACH CONTRACT.** With respect to each Contract purchased by CACS:
  A. The Contract evidences a transaction that is the direct result of a genuine and bona fide sale made by Dealer and not by a third party, and there are no other agreements between Dealer and Buyer(s), except under a MBP Contract or Credit Insurance Policy.
  B. The down payment and any payment due under the Contract was made by the Buyer(s) in cash, unless otherwise specified on the Contract, and no part thereof was loaned directly or indirectly by Dealer to Buyer(s) or made by Dealer.
  C. Neither Dealer nor any of its employees has made any oral or written promise or representation not contained in writing evidencing the Contract and approved by CACS.
  D. All business practices and operations of Dealer (including the sale of insurance or other coverages) and all Contracts and disclosures arising in connection with the sale of automobiles to Buyer(s) shall be in compliance with all applicable federal, state and local laws, regulations and ordinances included but not limited to the Fair Credit Reporting Act, the Equal Credit Opportunity Act and Regulation B, the Truth In Lending Act and Regulation Z and FTC rules and regulations.
  E. The Contract is owned by Dealer at the time of sale to Buyer(s), and is free and clear from all liens, set-offs or counterclaims, except as herein provided.
  F. The Contract and each guaranty and/or additional collateral agreement in connection therewith is a valid obligation entered into by bona fide and competent persons and is legally enforceable by CACS as assignee against each purported signatory thereof.
  G. Any credit information supplied by Dealer as to the Buyer(s) is true, complete and accurate to the best of Dealer's information and belief.
  H. The amounts charged any Buyer(s) for any insurance coverage shall not be in excess of the amounts permitted by applicable law.
  I. Dealer has taken all action required by Sections 3(A) and 4.
  J. The Vehicle and all options therein are accurately described in the Contract and such Vehicle was delivered by Dealer and accepted by Buyer(s).
  K. Dealer does not know of any fact that indicates the uncollectibility of any Contract.

(8000) CAC 6/95

EXHIBIT B



**11. DEALER LIABILITY.**
A. Repurchase. If a Dealer representation, warranty or covenant made in the assignment of a Contract to CACS is breached, or is untrue, or if Dealer fails to perform any of its obliga-
to CACS hereunder or otherwise, or if Dealer breaches any of its warranties under this Agreement, then Dealer shall promptly pay, CACS, upon receipt of CACS's demand, one or more of the fol-
ing amounts at the election of CACS: (1) the unpaid balance, as determined by CACS, of any or all Contracts purchased hereunder, less any unearned finance charges and any discounts in conne
with such Contracts; (2) all losses and expenses incurred by CACS as a result of such breach, or untruth, or failure to perform, including attorneys fees; and (3) out-of-pocket expenses paid or inc
by CACS in connection with the collection of any amount due under any such Contract, including attorneys' fees and costs of litigation, whether by or against CACS, and expenses with respect
repossessing, storing, repairing and selling the Vehicle. If Dealer fails to repurchase any Contracts as required by this Section 11, CACS may at its option (i) allow the Contracts to pay to matur
(iii) upon ten (10) days written notice to Dealer, sell any and all Contracts purchased from Dealer at public or private sale. In either event, CACS may apply the proceeds after deducting expense
reasonable attorneys fees, to the payment of Dealer's obligations hereunder, and Dealer will be responsible for any deficiency.
B. Transfer of Contracts. Upon Dealer's payment of the amounts payable pursuant to Section 11(A), such Contract may be assigned and/or endorsed by CACS to Dealer without reco
and without warranties of any kind and sent to Dealer. Dealer authorizes CACS to prepare and to execute, for and on behalf of Dealer and in its name, any instrument which in CACS's judgme
necessary to effectuate such transfer.
C. Failure to Repurchase. If Dealer fails to repurchase a Contract as required by Section 11, CACS may, in mitigation of its damages, reposses the Vehicle securing the Contract, in w
event Dealer will pay CACS, in cash upon demand, in addition to any other sums provided for herein, all reasonable costs of repossession, including court costs and reasonable attorneys' fees,
all costs of reconditioning, storing and reselling the Vehicle.
D. Rights of CACS on Breach. If Dealer breaches this Agreement in any respect, or any other agreement with CACS relating to a Contract, CACS shall have, in addition to all remedies
vided in this agreement and at law, the right to immediately terminate this Agreement, and deem null and void any approvals issued for the purchase of Contracts for which CACS has not paid
purchase price to Dealer. CACS shall have no obligation to purchase from Dealer any Contracts subject to an approval which is deemed null and void pursuant to this Section 11(D).
E. Dealer Indemnity. Dealer shall indemnify, defend and hold CACS harmless from any claims, losses, damages, liabilities and expenses, including attorneys' fees and costs of litiga
which relate to a Contract purchased by CACS and arise from Dealer's breach or default under this Agreement, Dealer's conduct, the failure of the transaction to comply with Dealer's warrant
Sections 9 or 10, or result from any act or omission on the part of Dealer.

**12. SETOFF.** CACS may deduct from any obligation or funds due Dealer any amount Dealer owes CACS and/or General Electric Capital Corporation (GE Capital). Any moneys, Contracts or any p
erty of any nature or description which may come into the possession of CACS may be held by CACS and applied, at any time, to offset any amounts owing to CACS and/or GE Capital.

**13. ADVERTISING.** Dealer agrees not to identify CACS in any advertising placed in any medium (including signs on Dealer's premises) without prior written approval from CACS.

**14. EXTENSION OR VARIATION OF CONTRACTS.** Dealer's liability hereunder shall not be affected by any settlement, extension, forbearance or variation in terms which CACS may grant in
nection with any Contract or by the discharge or release of the obligations of Buyer(s) or any other person thereunder by operation of law or otherwise.

**15. CONTRACT FORMS.** CACS shall furnish Dealer with fill-in-the-blank retail installment contract forms for transactions to be submitted to CACS. However, Dealer may use any contract for
which CACS has given its prior approval. CACS makes no representations or warranties of any kind, express or implied, relating to any form used to evidence a Contract.

**16. COLLECTION ON CONTRACTS.** CACS shall have the sole right to make collections on all Contracts and Dealer shall not solicit or make any collections or repossessions with respect t
Contract sold to CACS, nor accept the return of, nor make any substitution of, any of the subject matter of such Contracts. Dealer shall hold in trust and promptly forward to CACS all communica
and remittances received in reference to said Contract. Dealer shall hold in trust and promptly forward to CACS and communications and remittances received in reference to said Contract.

**17. WAIVER.** Dealer hereby waives any failure or delay on CACS's part in asserting or enforcing any right which CACS may have at any time hereunder. Dealer hereby expressly waives noti
acceptance of this Agreement, notices of non-payment and non-performance, notices of indebtedness outstanding at any time, protests, demands and prosecution of collection, for
sures and possessory remedies all as may be permitted by applicable law.

**18. DEALER NOT AN AGENT.** This Agreement and any action pursuant hereto does not make Dealer the agent or representative of CACS for any purpose. Dealer is not granted any express or im
right to bind CACS in any manner.

**19. TERM OF AGREEMENT.** This Agreement shall become effective upon its execution by Dealer and CACS and shall continue in force until terminated by either party. This Agreement may be
minated at any time by either party by written notice to the other, but such termination shall in no way affect the obligations of the parties on Contracts theretofor acquired by CACS, except that
far as there may be an agreement provided for rate participation, such agreement will likewise be terminated.

**20. NOTICES.** Except as expressly permitted in this Agreement, all notices required or permitted to be given hereunder shall be in writing and shall be effective upon personal delivery or depo
the U.S. mail, postage prepaid and properly addressed. Each party shall promptly provide the other with notice of any change in address.

**21. BINDING AGREEMENT; NO ASSIGNMENT.** This Agreement shall be binding upon and inure to the benefit of the parties hereto and their legal representatives, successors and assigns;
vided, however, that Dealer shall not assign this agreement or any rights hereunder by operation of law or otherwise without CACS's prior written consent.

**22. CREDIT INVESTIGATION.** Dealer authorizes CACS to investigate Dealers credit worthiness and credit capacity as may in CACS's discretion be necessary from time to time.

**23. AMENDMENTS.** This Agreement shall be amended either by a separate writing which is dated and executed both by CACS and Dealer, or by a separate writing which is forwarded to and rec
by Dealer from CACS, in which case the amendments contained therein shall be deemed accepted without qualification by Dealer upon the issuance pursuant to Dealer's request of the first Con
approval number by CACS following the receipt of such writing.

**24. REMEDIES.** CACS's rights hereunder are cumulative and not exclusive and any rights available to CACS pursuant to the Uniform Commercial Code or any other remedy at law or equity ma
exercised by CACS and any failure by CACS to exercise its rights hereunder shall not operate as a waiver of such rights.

**25. APPLICABLE LAW.** This Agreement shall be interpreted pursuant to the laws of the State of Illinois. Should any part of this Agreement be determined to be unenforceable by a court, such enf
ability shall not affect the rest of this Agreement.

Executed on _DECEMBER 21_, 19 _95_

Federal Tax I.D. No. _11-1967886_

_MAJOR CHEVROLET INC._
(Print Dealership Legal Name)

By: _____
_CHIEF OPERATING OFF_
Title

By: _____
Title

Street Address _43-40 NORTHERN BLVD._

City _LONG ISLAND CITY_    State _N.Y._    Zip _11_

Accepted:
Customized Auto Credit Services, Inc.

By: _____

Title: _VP OPERATIONS_
800 Hart Road, Barrington, IL 60010



DOCKETED
DEC 2 0 2001

# UNITED STATES DISTRICT COURT
JUDGE JOAN H. LEFKOW
## NORTHERN DISTRICT OF ILLINOIS

# **Civil Cover Sheet**
MAGISTRATE JUDGE MASON

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**01C 9719**

**Plaintiff(s):  GELCO CORPORATION, a
Delaware corporation, and CUSTOMIZED
AUTO CREDIT SERVICES, INC., a
Delaware corporation**

County of Residence: Lake County

Plaintiff's Atty:    David B. Johnson/Michael
Andolina
Sidley Austin Brown & Wood
Bank One Plaza, 10 S.
Dearborn, Chicago, IL 60603
(312) 853-7000

**Defendant(s):MAJOR CHEVROLET, INC., a
New York corporation**

County of Residence:

Defendant's Atty:

01 DEC 19 PM 4: 17
CLERK
U.S. DISTRICT COURT
FILED-ED4

---

II. Basis of Jurisdiction:        **4. Diversity (complete item III)**

III. Citizenship of Principle
Parties **(Diversity Cases Only)**

Plaintiff:-**1 Citizen of This State**
Defendant:-**2 Citizen of Another State**

IV. Origin :                **1. Original Proceeding**

V. Nature of Suit:            **190 Other Contract**

VI.Cause of Action:        **28 U.S.C. Section 1332 -- Plaintiffs allege Breach of Contract,
Fraud and violation of the Illinois Consumer Fraud Act**

VII. Requested in Complaint
Class Action:**No**
Dollar Demand:**$2.95 million**
Jury Demand:**Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

---

**Signature:**    _Michael C. Allen_

**Date:**  12/19/01

DOCKETED
DEC 2 0 2001

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS   JUDGE JOAN H. LEFKOW
### Eastern Division

MAGISTRATE JUDGE MASON

In the Matter of



GELCO CORPORATION, a Delaware corporation, and
CUSTOMIZED AUTO CREDIT SERVICES, INC., a Delaware
corporation, Plaintiffs,
v.
MAJOR CHEVROLET, INC., a New York corporation, Defendant.

Case Number: 01C 9719

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Gelco Corporation and Customized Auto Credit Services, Inc.

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME David B. Johnson | NAME Michael C. Andolina |
| FIRM Sidley Austin Brown & Wood | FIRM Sidley Austin Brown & Wood |
| STREET ADDRESS Bank One Plaza, 10 South Dearborn | STREET ADDRESS Bank One Plaza, 10 South Dearborn |
| CITY/STATE/ZIP Chicago, IL 60603 | CITY/STATE/ZIP Chicago, IL 60603 |
| TELEPHONE NUMBER (312) 853-7107 | TELEPHONE NUMBER (312) 853-2228 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6186478 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6269334 |
| MEMBER OF TRIAL BAR? YES ✔ NO | MEMBER OF TRIAL BAR? YES NO ✔ |
| TRIAL ATTORNEY? YES ✔ NO | TRIAL ATTORNEY? YES NO ✔ |
| | DESIGNATED AS LOCAL COUNSEL? YES NO |
| (C) | (D) |
| SIGNATURE | SIGNATURE |
| NAME | NAME |
| FIRM | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES NO | MEMBER OF TRIAL BAR? YES NO |
| TRIAL ATTORNEY? YES NO | TRIAL ATTORNEY? YES NO |
| DESIGNATED AS LOCAL COUNSEL? YES NO | DESIGNATED AS LOCAL COUNSEL? YES NO |

